IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF OHIO
EASTERN DIVISION

Warren Drilling Co., Inc.,

        Plaintiff,

v.

Equitable Production Company,

        Defendant.

Case No. 2:12-cv-425

Judge Graham

Magistrate Judge Kemp

Opinion and Order

    Plaintiff Warren Drilling Company, Inc. brings this suit for breach of contract and indemnification against defendant Equitable Production Company (now known as "EQT"). EQT has filed a counterclaim for indemnification against Warren Drilling. This matter is before the court on the parties' cross motions for summary judgment. At issue is which party bears the contractual duty to indemnify the other against a tort action brought by property owners against both Warren and EQT for allegedly contaminating their water supply. For the reasons stated below, the court finds as a matter of law that EQT bears the duty to indemnify Warren.

**I.    Background**

    Warren Drilling is an Ohio corporation that provides drilling services in connection with oil and gas wells in the Appalachian Basin areas of Kentucky, Ohio, Pennsylvania and West Virginia. See Dep. of Dan Warren (doc. #59-1), pp. 6-7. EQT is a Pennsylvania corporation and is a natural gas production company that also operates in Appalachian Basin. On March 15, 2006, Warren and EQT entered into a Drilling Contract under which Warren was to conduct drilling operations at EQT's natural gas wells in Jackson County, West Virginia. See Drilling Contract (doc. #29-1).

    Under the Drilling Contract, Warren agreed to carry several types of insurance, including a commercial general liability policy. See Drilling Contract, § 11.1. Before conducting drilling operations, Warren obtained a commercial general liability policy from ACE American Insurance Company. See ACE Policy (doc. #29-2).

    The Drilling Contract contained several indemnification provisions. It contained a general provision in which Warren agreed, "[e]xcept to the extent this Agreement specifically provides otherwise," to defend, indemnify and hold EQT harmless against all "all claims, demands, and

1

causes of action of every kinds and character, without limit and without regard to the cause or causes thereof or the negligence of any party or parties, arising in connection herewith on account of bodily injury, death, or damage to property." Drilling Contract, § 11.3.

Other, more specific provisions shifted the duty of indemnification between the parties depending on the nature of the underlying loss or claim. See Drilling Contract, § 11.4 (placing the duty to indemnify on EQT for claims brought by EQT employees against Warren, except for losses caused the negligence or misconduct of Warren); § 11.8 (placing the duty to indemnify on EQT for claims resulting from operations that caused loss or impairment of a property right in oil or gas).

At issue in this action are the indemnification provisions dealing with pollution or contamination. The Drilling Contract placed on Warren a duty to indemnify with respect to claims or liability for contamination that originated on or above the surface of the land or water and was from liquids or solids whatsoever in Warren's in possession and control.

> Contractor [Warren] shall assume full responsibility for and shall defend, indemnify, and hold Operator [EQT] and ifs officers, directors, employees and joint owners harmless from and against any loss, damage, expense, claim, fine and penalty, demand, or liability for pollution or contamination, including control and removal thereof, <u>originating on or above the surface of the land or water</u> from spills, leaks, releases or discharges of petroleum, fuels, lubricants, motor oils, pipe dope, paints, solvents, ballast, bilge, sludge, garbage, drilling mud or any other liquid or solid whatsoever <u>in possession and control of Contractor</u> and without regard to negligence of any party or parties.

Drilling Contract, § 11.5 (emphasis added).

For claims or liability for pollution or contamination not covered by § 11.5, EQT had the duty to indemnify.

> Operator shall assume full responsibility for and shall defend, indemnify, and hold Contractor harmless from and against any loss, damage, expense, claim, fine and penalty, demand, or liability for pollution or contamination, including control and removal thereof, arising out of or connected with services performed at Operator's location by Contractor thereunder, and not assumed by Contractor in Subparagraph 11.5, including but not limited to that which may result from well fire, blowout, cratering, seepage, or any other uncontrolled flow of oil, gas, water, or other substance except to the extent such loss, damages, expense, claim, fine and penalty, demand, or liability may be covered by Contractor's insurance, or such loss, damage, expense, claim, fine and penalty, demand or liability is caused by or is the result of the negligence or willful misconduct of Contractor, its employees or subcontractors.

Drilling Contract, § 11.6.

2

Warren performed drilling operations for EQT on three natural gas wells from November 2007 to February 2008 in Jackson County, West Virginia. See Warren Well and Drilling Reports (doc. #57-27, #57-28). These wells were numbered Gas Wells 511044, 511356, 511358. Warren states that EQT paid Warren in full under the contract and did not make any complaints or objections concerning the work Warren performed. See Am. Compl. (doc. #29), ¶¶ 8, 9.

Gas Wells 511044, 511356, 511358 were located on property owned by Dennis and Tamera Hagy. In October 2010, the Hagys brought suit in West Virginia state court against EQT, Warren and two other companies contracted by EQT to perform services at those natural gas wells. In 2007, the Hagys received notice from EQT of its filing for state permits to drill new natural gas wells on their property. In October 2007, the Hagys signed surface owner waivers stating that they had no objections to the new wells. In their complaint, the Hagys alleged that defendants used a hydraulic fracturing drilling process that discharged fracking fluid into the ground and that this fracking fluid contained toxic chemicals. See Hagy Compl. (doc. #29-3). They further alleged that the fracking fluid contaminated their well water supply and that as a result they suffered personal injuries and damage to property (loss of the use and enjoyment of their property, and loss to the value of their property). They asserted claims for negligence, private nuisance, strict liability, trespass, and medical monitoring. The action was removed to federal court in December 2010 on the basis of diversity jurisdiction. See Hagy v. Equitable Prod. Co., et al., No. 2:10-cv-1372 (S.D.W.V.).

In November 2010, Warren filed a claim with ACE for coverage and a defense under the general liability policy in connection with the Hagy litigation. See Aff. of Gene Mapes (doc. #57-1), ¶ 14. On April 15, 2011, ACE denied coverage and refused to defend Warren in the Hagy litigation.[1] See Aff. of Dan Warren (doc. #57-2), ¶ 7. Warren then notified EQT in May 2011 that ACE had denied coverage, and Warren asserted that EQT had an obligation under the Drilling Contract to indemnify Warren for all costs in defending the Hagy action. See May 13, 2011 Letter (doc. #29-5). There is no indication on the record whether EQT formally responded to Warren's letter, but it is uncontroverted that EQT did not indemnify or defend Warren.

Warren thus defended itself in the Hagy action and reached a $40,000 settlement with the Hagys in April 2012. See Warren Aff., ¶ 11. In addition to the settlement amount, Warren alleges

---

[1] There is a suggestion in the record that ACE denied coverage because of the lapse of time between when the Hagys' water was allegedly contaminated in 2007 or 2008 and when Warren made its claim for coverage in 2010. See Dep. of Emily Speece (doc. #59-2), p. 16; see also May 13, 2011 Letter (doc. #29-5), p. 2.

that it expended $155,000 in defending the Hagy litigation, including attorneys' fees, costs, and expert fees.

In May 2012 the federal district court in West Virginia granted summary judgment to EQT in the Hagy action on the basis that the Hagys had signed waivers that released EQT from liability. On appeal, the Fourth Circuit affirmed the district court's grant of summary judgment. See Hagy v. Equitable Prod. Co., 541 Fed. App'x 316 (4th Cir. Oct. 8, 2013). Of the other two defendants in the Hagy action, one settled with the Hagys and the other obtained summary judgment on the grounds that the Hagys had submitted no evidence of negligent conduct on its part – a decision which too was affirmed on appeal by the Fourth Circuit. Id.

On April 13, 2012 Warren filed this action against EQT and ACE in the Court of Common Pleas of Noble County, Ohio. Defendants removed the action to this court on May 17, 2012 on diversity grounds. Warren settled its claims against ACE, and ACE was dismissed as a defendant in April 2013.

Warren then amended the complaint to name only EQT as a defendant. Warren asserts claims for contractual indemnification and common law indemnification against EQT. Warren seeks an award of approximately $195,000 for its fees, costs and settlement in the Hagy litigation, as well as an award of fees and costs incurred in bringing this action.

In its answer and counterclaim, EQT asserts claims for breach of contract and declaratory judgment. EQT alleges that Warren breached the Drilling Contract by failing to procure adequate insurance to cover the type of loss for which Warren bore the duty to indemnify under § 11.5 of the Drilling Contract. EQT alleges that as a result of Warren's failure, it was forced to expend funds to defend itself in the Hagy litigation. EQT further seeks a declaratory judgment that it is not required to indemnify Warren for the Hagy litigation.[2]

---

[2] EQT's counterclaim is stated slightly differently than how EQT characterizes it in the motion for summary judgment. In the counterclaim, EQT alleges that Warren breached the Drilling Contract by failing to procure adequate insurance. In the motion, EQT characterizes its counterclaim as one for indemnification (that Warren breached the Drilling Contract by not indemnifying EQT), and EQT argues that it is entitled as a matter of law to indemnification from Warren. See, e.g., EQT Mot. for Summ. J. (doc. #61), pp. 7, 9-12; EQT Reply (doc. #65), pp. 2-4. Because the counterclaim alleges both that Warren had a legal obligation to compensate EQT for its costs in defending the Hagy litigation and that § 11.5 of the Drilling imposed a duty to indemnify on Warren for the type of loss here, the court will treat the counterclaim as one for contractual indemnification. See Counterclaim (doc. #34), ¶¶ 8, 15, 19. This is the interpretation that EQT states its counterclaim should be given. See EQT Reply, pp. 6-7.

Both parties have moved for summary judgment on the issue of which party bears the contractual duty of indemnification against the costs associated with the Hagy litigation.

## II.    Standard of Review

Under Federal Rule of Civil Procedure 56, summary judgment is proper if the evidentiary materials in the record show that there is "no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); see Longaberger Co. v. Kolt, 586 F.3d 459, 465 (6th Cir. 2009). The moving party bears the burden of proving the absence of genuine issues of material fact and its entitlement to judgment as a matter of law, which may be accomplished by demonstrating that the nonmoving party lacks evidence to support an essential element of its case on which it would bear the burden of proof at trial. See Celotex Corp. v. Catrett, 477 U.S. 317, 322-23 (1986); Walton v. Ford Motor Co., 424 F.3d 481, 485 (6th Cir. 2005).

The "mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no *genuine* issue of *material* fact." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 247-48 (1986) (emphasis in original); see also Longaberger, 586 F.3d at 465. "Only disputed material facts, those 'that might affect the outcome of the suit under the governing law,' will preclude summary judgment." Daugherty v. Sajar Plastics, Inc., 544 F.3d 696, 702 (6th Cir. 2008) (quoting Anderson, 477 U.S. at 248). Accordingly, the nonmoving party must present "significant probative evidence" to demonstrate that "there is [more than] some metaphysical doubt as to the material facts." Moore v. Philip Morris Cos., Inc., 8 F.3d 335, 340 (6th Cir. 1993).

A district court considering a motion for summary judgment may not weigh evidence or make credibility determinations. Daugherty, 544 F.3d at 702; Adams v. Metiva, 31 F.3d 375, 379 (6th Cir. 1994). Rather, in reviewing a motion for summary judgment, a court must determine whether "the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." Anderson, 477 U.S. at 251-52. The evidence, all facts, and any inferences that may permissibly be drawn from the facts must be viewed in the light most favorable to the nonmoving party. Matsushita Elec. Indus. Co. v. Zenith

---

Further, in briefing the motions for summary judgment, EQT does not put the adequacy of insurance coverage at issue; that is, EQT does not assert that Warren's alleged failure to procure adequate insurance either constitutes a breach of contract or provides grounds to defeat Warren's claim for indemnification. Rather, EQT admits that Warren did obtain an insurance policy and that the Drilling Contract did not require EQT's approval of the policy. See EQT Mot. for Summ. J., p. 11 n. 9.

Radio Corp., 475 U.S. 574, 587 (1986); Eastman Kodak Co. v. Image Technical Servs., Inc., 504 U.S. 451, 456 (1992). However, "[t]he mere existence of a scintilla of evidence in support of the plaintiff's position will be insufficient; there must be evidence on which the jury could reasonably find for the plaintiff." Anderson, 477 U.S. at 252; see Dominguez v. Corr. Med. Servs., 555 F.3d 543, 549 (6th Cir. 2009).

### III. Discussion

The Drilling Contract contained a choice-of-law provision selecting Pennsylvania law, and the parties agree that Pennsylvania law applies here. See Drilling Contract, § 24. Under Pennsylvania law, a right to indemnity can arise from express contract, implied contract, or by common law. See Agere Systems, Inc. v. Advanced Envtl. Tech. Corp., 552 F.Supp.2d 515, 521 (E.D. Pa. 2008). Warren and EQT each assert an indemnification claim under an express contract.[3]

Contractual indemnity agreements are valid under Pennsylvania law, though they "are to be narrowly interpreted in light of the parties' intentions as evidenced by the entire contract." Consolidated Rail Corp. v. Delaware River Port Auth., 880 A.2d 628, 632 (Pa. Super. Ct. 2005). See also Kiewit Eastern Co., Inc. v. L & R Const. Co., Inc., 44 F.3d 1194, 1202 (3d Cir. 1995) ("Pennsylvania courts require that an indemnity agreement be strictly construed against the party asserting it.") (citing cases). "'In interpreting the scope of an indemnification clause, the court must consider the four corners of the document and its surrounding circumstances.'" Chester Upland School Dist. v. Edward J. Meloney, Inc., 901 A.2d 1055, 1059 (Pa. Super. Ct. 2006) (quoting Widmer Engineering, Inc. v. Dufalla, 837 A.2d 459, 472 (Pa. Super. Ct. 2003)).

Three distinct issues are in dispute here: (1) which party has a right to indemnification under the Drilling Contract; (2) whether that party must prove that the claim made against it by the Hagys was legally valid; and (3) whether its expenses in the Hagy litigation were reasonable.[4] See Martinique Shoes, Inc. v. New York Progressive Wood Heel Co., 217 A.2d 781, 783 (Pa Super. Ct. 1966); McClure v. Deerland Corp., 585 A.2d 19, 22 (Pa. Super. Ct. 1991); Daily Express, Inc. v. Northern Neck Transfer Corp., 490 F. Supp. 1304, 1306-07 (M.D. Pa. 1980); Total Landscaping

---

[3] Though Warren asserted a common law claim for indemnification in its complaint, at the summary judgment stage it relies solely on the argument that the source of its right for indemnification is the Drilling Contract.

[4] Timely notice of the asserted right is often an issue in indemnification cases. See generally Ultramed, Inc. v. Beiersdorf-Jobst, Inc., 98 F.Supp.2d 609, 611-12 (M.D. Pa. 1998) (discussing Pennsylvania law on failure to give notice). Notice is not at issue here, as it is clear that Warren notified EQT of its asserted right to indemnification before defending itself in the Hagy action.

Care, LLC v. Tower Cleaning Sys., Inc., No. 10-cv-6542, 2012 WL 676981, at *7 (E.D. Pa. March 1, 2012).

### A. The Contractual Indemnification Provisions

The Hagys alleged that they suffered personal injuries and property damage as a result of contamination of their well water supply.  See Hagy Compl., ¶ 19; see also Hagy v. Equitable Prod. Co., 541 Fed. App'x 316, 317 (4th Cir. Oct. 8, 2013) ("[The Hagys] filed this lawsuit . . . alleging that Defendants had contaminated their well water supply and that, as a result, they had suffered damages to personal property as well as personal injuries.").  As such, Warren and EQT each argue that the other party bears the duty to indemnify under one of the Drilling Contract's two "pollution and contamination" provisions.

EQT contends that § 11.5 applies here because the claim or liability in the Hagy action was for contamination "originating on or above the surface of the land or water."  If § 11.5 applies, Warren would have a duty to indemnify EQT.  Warren counters that the Hagy claim was for contamination that originated below the surface of the ground.  Under Section 11.6, EQT has the duty to indemnify Warren against claims for contamination that are not covered by § 11.5 and not covered by insurance.

#### 1. Section 11.5

In order for § 11.5 to apply, the contamination must (1) originate "on or above the surface of the land or water" and (2) be from a liquid or solid "in the possession and control of" Warren.  The record before the court demonstrates that neither requirement is satisfied.

As to the first requirement, the court finds that EQT has failed to submit evidence that would create a genuine dispute in support of its position that the contamination originated on or above the surface of the land or water.  The Hagy complaint alleged that their well water supply was contaminated by the forced discharge of fracking fluid "into the ground" during attempts to release natural gases "contained under the ground."  See Hagy Compl., ¶¶ 5, 11.  Moreover, discovery in the Hagy litigation produced no facts showing that the alleged contamination originated on or above the surface of the land or water.  The Hagys' expert in geological engineering, William Clay Kimbrell, identified all of the potential pathways by which a fracking-related substance could have contaminated the Hagy's water supply, which was located 90 feet below the surface of the ground.  See Kimbrell Report (doc. #57-24), pp. 3-6; Kimbrell Dep. (doc. #57-23), p. 139.  Kimbrell included a surface spill, which would then seep into the ground and migrate to the water supply, as a theoretic

7

possibility.[5]  See Kimbrell Report, p. 6 ("Another potential source for contamination of shallow fresh water zones is improper storage of the waste fluids on the surface in pits . . . ."); Kimbrell Dep., p. 139.  However, he opined that a surface spill was not likely to have been the origin of contamination in the Hagys' case, in part because certain chemical indicators of pit fluids were not present in the water samples.  See Kimbrell Dep., pp. 169-72 (testifying that it was "unlikely" that the contamination originated from the surface); Kimbrell Report, p. 9 (explaining that substances present in the pit would not have caused certain indicators found in the water samples).  Kimbrell further explained that there was no evidence to indicate that "anything got out of the pit, to the point it could have infiltrated into the subsurface" or that "anything that was spilled on the surface . . . made its way through the subsurface to the Hagy water well."  Kimbrell Dep., pp. 168-69; see also Kimbrell Report, p. 11 (noting that his review of drilling reports and related documents found that there was "[n]o volume of escaped material" from the pits documented); accord Kimbrell Dep., p. 165.

In contrast, Kimbrell concluded that "a very likely pathway" of contamination was a subsurface one.  Kimbrell Dep., pp. 96-97; accord, id., p. 170 ("I think it's more likely that [contamination] came from subsurface during the fracturing, rather than surface.").  Kimbrell stated, "[M]y opinion is that it was during the fracturing process that these contaminant fluids would have gotten in touch with the fresh water," id., p. 180, and he based his opinion on several considerations.  One consideration was the relatively short time frame in which the contaminants had to migrate from the drilling site to the water supply.  Kimbrell believed that the pressure differential created during the fracturing process would have caused a "migration potential" sufficient to move the fluids from the wellbore to the water supply in the given time frame.  Kimbrell Report, pp. 8-9; Kimbrell Dep., p. 262.  Further, he found certain indicators in the water samples that would have been present only as the byproduct of the fracturing process and not a pit spill.  Kimbrell Report, p. 9 (noting the increase in manganese, iron, arsenic and radon that likely could have only been caused by the "acidic nature of the fracture fluid encountering various rocks" along the subsurface pathway).  Finally, Kimbrell found that the presence of old wellbores on the Hagys' property and that the occurrence of an earthquake at the time of one of the fracture jobs could have provided the subsurface fractures by which fracking fluids migrated from the wellbore to the water supply.  See

---

[5]  Kimbrell was asked to assume for purposes of his report that the Hagys' water supply had in fact been contaminated.  This assumption was based on the conclusion of another expert whose analysis of pre- and post-fracking water samples from the Hagys' well found that the water supply had been contaminated.  See Kimbrell Report, p. 8; Kimbrell Dep., p. 96.

Kimbrell Report, p. 10; Kimbrell Dep., pp. 105-12. These considerations led Kimbrell to conclude that a subsurface pathway was "the most likely" origin of the alleged contamination. Id., p. 172.; pp. 121, 234, 254. EQT has not cited any evidence to the contrary and points only to Kimbrell's statement that an above-the-surface origin was a theoretic possibility.

Turning to the second prong of § 11.5 – the "possession and control" requirement – the court likewise finds that EQT has failed to submit evidence that would create a genuine dispute in support of the position that the contaminating fluids were in the possession and control of Warren. EQT has made no attempt to show that the contaminating fluids were in Warren's possession and control, and the record establishes that the well sites were always under the control of EQT. The Drilling Contract was a daywork contract (as opposed to a turnkey contract) and, as such, EQT was in total control of the well sites. See Drilling Contract, § 3.2; Dep. of David White III (doc. #57-25), pp. 31-32, 61, 71 (testifying that EQT was in "total command" and made every decision as to drilling operations). Moreover, Warren's role under the Drilling Contract was to drill the wellbores (not to conduct the fracturing process) and EQT has not produced any evidence that would support a finding that Warren ever had in its possession the fracking fluids that allegedly contaminated the Hagys' water supply. In contrast, Warren has demonstrated that it was not in possession of any potentially contaminating fluids. See id., pp. 51, 53 (stating that Warren had "nothing to do" with the fracking stage and left the site by the time fracking began); Warren Aff., ¶ 15.

Accordingly, the court finds as a matter of law that § 11.5 does not apply to this dispute.

    **2.**    **Section 11.6**

The court does find as a matter of law that § 11.6 applies here. Under this section EQT must indemnify Warren for claims of pollution or contamination to the extent that they are: (1) "not assumed by Contractor [Warren] in Subparagraph 11.5," (2) not covered by Warren's insurance, and (3) not caused by the negligence or misconduct of Warren or its employees.

None of these three limitations come into play here. As found above, § 11.5 does not apply. EQT has conceded that the claim was not covered by Warren's insurance. See EQT's Responses to Warren's Second Set of Requests for Admission (doc. #57-4), Request No. 1. And EQT has also conceded that the Hagys' loss or damage was not caused by the negligence or misconduct of Warren or its employees. See EQT's Responses to Warren's First Set of Requests for Admission (doc. #57-3), Request No. 14.

Accordingly, the court finds under § 11.6 of the Drilling Contract that EQT has a duty to indemnify Warren in connection with the Hagy litigation.

B.	The Validity of the Hagys' Claim

EQT argues that even if § 11.6 does apply, Warren is not entitled to indemnification because Warren has not demonstrated the validity of the Hagys' underlying claim against Warren. See McClure v. Deerland Corp., 585 A.2d 19, 23 (Pa Super. Ct. 1991). One way a party asserting a right to indemnification may satisfy the validity requirement is to show that it made payment to an injured party pursuant to a court verdict or judgment. Id. EQT points out that where there has been a settlement prior to a determination of legal liability, the rule under Pennsylvania law is that an indemnitee is treated as a "volunteer" and must be able to establish in any later action for recovery against an indemnitor that it was actually liable to the injured party. See Martinique Shoes, Inc. v. New York Progressive Wood Heel Co., 217 A.2d 781 (Pa. Super. Ct. 1966). Warren responds that when the indemnity obligation arises out of an express contract, the parties may agree to a less strict standard than the "actual liability" standard. See Best Products Co., Inc. v. A.F. Callan and Co., Inc., No. CIV.A.90-5326, 1997 WL 83737, at **7-8 (E.D. Pa. Feb. 26, 1997). Warren contends that the Drilling Contract required EQT to defend and indemnify Warren against all claims, not just claims for which Warren was actually liable.

EQT is correct that the rule in Pennsylvania is that:

> voluntary payments in exchange for the compromise of a claim are not compulsory and do not entitle the paying party to a claim for subrogation or indemnity. . . . To be entitled to indemnity where there has been a voluntary payment, the paying party must demonstrate that he or she was legally liable and could have been compelled to satisfy the claim.

Kemper Nat'l P & C Cos. v. Smith, 615 A.2d 372, 376 (Pa. Super. Ct. 1992) (citing Tugboat Indian Co. v. A/S Ivarans Rederi, 5 A.2d 153, 155 (Pa. 1939)). Under this rule, a showing of potential liability is not sufficient; rather, the indemnitee must in the second action offer "practically the same evidence" that the injured party would have submitted in the first action in order to prove the indemnitee's liability to the injured party. Martinique, 217 A.2d at 783; see also Philadelphia Elec. Co. v. Hercules, Inc., 762 F.2d 303, 317 (3d Cir. 1985) (indemnitee must establish actual liability); Besser Co v. Paco Corp., 671 F. Supp. 1010, 1012-13 n. 3 (M.D. Pa. 1987) (noting that Pennsylvania courts have not followed other jurisdictions in accepting "the potential liability theory" and that "a party making a voluntary payment assumes the risk of being able to prove the actionable facts upon which his liability depends").

Even so, Warren is likewise correct that "courts recognize that the parties may agree to contract out of the actual liability requirement." Casey v. Ryder Truck Rental, Inc., No. 00-cv-2856,

10

2005 WL 1150228, at *8 (E.D.N.Y. May 16, 2005) (citing Pennsylvania cases).  To determine whether the parties intended to contract to a less strict standard, a court should look to the plain language of their agreement.  Mace v. Atlantic Refining & Marketing Corp., 785 A.2d 491, 496-97 (Pa. 2001); Total Landscaping Care, LLC v. Tower Cleaning Sys., Inc., No. 10-cv-6542, 2012 WL 676981, at *7 (E.D. Pa. March 1, 2012).  Courts have found such an intent where the parties' agreement provides that the indemnity obligation is triggered by notice of a claim or demand against the parties, see Total Landscaping, 2012 WL 676981, at *7, or by "potential" or "alleged" liability, see Volkswagen of Am., Inc. v. Bob Montgomery, Inc., No. 82-cv-3598, 1985 WL 2824, at *3 (E.D. Pa. Sept. 25, 1985).

The court finds that the Drilling Contract contains plain language by which EQT's duty to indemnify was triggered by the making of a claim for contamination against Warren.  Section 11.6 provides that EQT "shall assume full responsibility for and shall defend, indemnify, and hold Contractor harmless from and against any loss, damage, expense, claim, fine and penalty, demand, or liability for pollution or contamination."  Two aspects of this provision are key to the court's interpretation.  First, the Drilling Contract's language is not restricted to "loss" or "liability" but extends EQT's obligation to indemnify to any "claim" or "demand."  The words "claim" and "demand" denote an "assertion of an existing right; any right to payment or to an equitable remedy, *even if contingent or provisional*."  Black's Law Dictionary, 9th Ed. (definition of "claim") (emphasis added).  The use of those words in the Drilling Contract demonstrates an intent not to follow a standard of actual liability.  See Total Landscaping, 2012 WL 676981, at *7 (holding that parties intended to contract away from the actual liability standard where they used words "claim" and "demand").

Second, the Drilling Contract's indemnity obligation includes a duty to "defend" against any claim or demand.  This language too is inconsistent with the notion that EQT could await a final determination of actual liability before its obligation was triggered.  A duty to defend is triggered when the injured party's claim is "*potentially* in the scope" of the agreement or policy.  Am. & Foreign Ins. Co. v. Jerry's Sport Ctr., Inc., 2 A.3d 525, 541 (Pa. 2010) (emphasis added).  There is no doubt here that the Hagys' claim for contamination was potentially in the scope of the Contract, as both Warren and EQT have argued that the other owed it a duty under the Contract.

In Mace v. Atlantic Refining & Marketing, a contractual indemnity agreement provided that a franchisee would indemnify and defend the franchisor from and against all claims, losses, and damages relating to personal injuries on the franchisee's premises.  Though addressing a separate

11

legal issue of whether to apply Pennsylvania's general rule against a party indemnifying itself against its own negligence, the Pennsylvania Supreme Court's reasoning has application to the case at hand. The court held that the plain language of the parties' agreement should be given effect when it demonstrates an intent to contract away from a default rule that the parties have the ability to displace by contractual agreement. 785 A.2d at 496. The parties' use of the language "defend" against "all claims" relating to personal injuries was "clear and unambiguous" in demonstrating an intent that the franchisee defend the franchisor against all such claims – to hold otherwise "would render indemnification meaningless." Id.

So too here EQT agreed to defend and indemnify Warren from and against "any" claim for contamination. The parties employed language in the Drilling Contract that demonstrated their intent that EQT's obligation would not depend upon a finding of actual liability against Warren. To hold otherwise would render § 11.6 meaningless.

### C. The Reasonableness of the Settlement Amount and Warren's Expenses

Warren bears the burden of proving both the reasonableness of the settlement amount and its litigation expenses. County of Delaware v. J.P. Mascaro & Sons, Inc., 830 A.2d 587, 593 (Pa. Super. Ct. 2003) (citing Tugboat Indian, 5 A.2d 153; McClure, 585 A.2d 19).

Warren has not yet satisfied its burden. Though it has submitted evidence that it reached a $40,000 settlement with the Hagys, see Warren Aff., ¶ 11, it has not provided any analysis as to why that amount was reasonable, other than to vaguely assert that a trial would have been expensive. Further, Warren has merely alleged that it expended $155,000 in attorneys' fees and costs in connection with the Hagy litigation, without submitting any evidence to substantiate that amount. And Warren's analysis of the reasonableness of the alleged amount is largely limited to the point that it was less than what Warren believes EQT's fees and costs were in the Hagy litigation.

Accordingly, the court will instruct the parties to submit additional evidence and briefing on the issues of the reasonableness of the settlement amount and of the litigation expenses.

### D. Attorney's Fees and Costs in Litigating this Action

Warren further seeks its fees and costs in bringing this action to enforce its right to indemnification under § 11.6 of the Drilling Contract. Warren correctly argues that § 11.6 contained "hold harmless" language that is typically interpreted to mean that the indemnitee "is entitled to its costs and attorney's fees incurred to enforce the contractual indemnity provision." 41 Am. Jur. 2d Indemnity § 30; accord Delle Donne & Assoc., LLP v. Millar Elevator Serv. Co., 840 A.2d 1244, 1256 (Del. 2004).

EQT has offered no argument in opposition to Warren's assertion to a contractual right to recover its fees and costs incurred in this litigation. Accordingly, the court will also instruct the parties to submit additional evidence and briefing on the issue of the reasonableness those fees and costs.

## IV. Conclusion

The court finds as a matter of law that EQT owed a duty under § 11.6 of the Drilling Contract to defend and indemnify Warren from and against the Hagy litigation and that EQT has breached that duty. Warren's motion for summary judgment (doc. 58) is GRANTED as to the issue of liability and EQT's counterclaim is dismissed. EQT's motion for summary judgment (doc. 60) is DENIED in its entirety. Warren's motion for leave to file a sur-reply (doc. #66) is DENIED.

Within 30 days of the date of this order, Warren shall submit a brief with supporting evidentiary materials directed to the issues of the reasonableness of the settlement amount and of its litigation expenses in the Hagy litigation. Response and reply briefs will be due in accord with S.D. Ohio Local Civil Rule 7.2(a)(2).

Within 90 days of the date of this order, Warren shall submit a brief with supporting evidentiary materials directed to the issue of the reasonableness of its attorney's fees and costs incurred in this litigation. Response and reply briefs will be due in accord with Rule 7.2(a)(2).

s/ James L. Graham
JAMES L. GRAHAM
United States District Judge

DATE: April 16, 2014